1
2
3
4
5
6
7

8              **UNITED STATES DISTRICT COURT**

9              **EASTERN DISTRICT OF CALIFORNIA**

10

11   LAURA WILKINS,                        )  Case No.: 1:15-cv-00819 JLT
                                           )
12              Plaintiff,                 )  ORDER DIRECTING ENTRY OF JUDGMENT IN
                                           )  FAVOR OF DEFENDANT CAROLYN COLVIN,
13        v.                               )  ACTING COMMISSIONER OF SOCIAL
                                           )  SECURITY AND AGAINST LAURA WILKINS
14   CAROLYN W. COLVIN,                    )
     Acting Commissioner of Social Security, )
15                                         )  (Doc. 13)
                                           )
16              Defendant.                 )
     _____)

17          Laura Wilkins asserts she is entitled to disability insurance benefits and supplemental security

18   income under Titles II and XVI of the Social Security Act.  Ms. Wilkins argues the administrative law

19   judge erred in her step two analysis, when considering the opinions of a consultative examiner and the

20   treating physician and in evaluating her subjective complaints.  Thus, she seeks judicial review of the

21   decision to deny her application for benefits.  Because the Court finds the ALJ did not err, the decision

22   is **AFFIRMED**.

23                              **PROCEDURAL HISTORY**

24          Plaintiff filed her applications for benefits on October 24, 2011, alleging disability beginning on

25   March 10, 2011.[1]  (Doc. 6-3 at 12)  The Social Security Administration denied Plaintiff's applications at

26   both the initial level and upon reconsideration. (*See generally* Doc. 6-3.)  After requesting a hearing,

27

28   _____
     [1] Originally, she claimed her disability began on November 1, 2009 but later amended the onset date. (Doc. 6-3 at 12)

                                                    1

Plaintiff testified before an ALJ on July 15, 2013. The ALJ determined Plaintiff was not disabled and issued an order denying benefits on August 1, 2013. (Doc. 6-3 at 12-20)  When the Appeals Council denied Plaintiff's request for review of the decision on August 1, 2013, the ALJ's determination became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

1   the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

2   gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

### ADMINISTRATIVE DETERMINATION

4   To achieve uniform decisions, the Commissioner established a sequential five-step process for

5   evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires

6   the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of

7   alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of

8   the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4)

9   had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to

10  perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must

11  consider testimonial and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

12  **A.     Relevant Medical Opinions**

13  On March 10, 2011, the plaintiff was taken to the emergency room after suffering a seizure

14  while traveling in Nevada.  (Doc. 6-8 at 4)  She had a history of seizures, but she had not had a seizure

15  for about two years. Id. 9, 13, 15.  Upon recovery from the seizure on March 10, she had confusion and

16  mild forgetfulness.  Id. at 6.  She reported that her doctor had recently changed her dosage of

17  anticonvulsant medication and she had drunk three to four alcoholic before suffering the seizure.  Id. at

18  9-10, 13, 15.  A CT scan revealed no acute changes in her brain and an EEG showed no further seizure

19  activity.  Id. at 15, 17.  Her primary care doctor, Dr. Austin, advised her to resume her full dose of the

20  anti-seizure medication. (Doc. 6-10 at 39)

21  By this time, the plaintiff had undergone a "right temporal craniotomy  . . . with selective

22  removal of the amygdala and hippocampus."  (Doc. 6-10 at 24)  Before the surgery, she reported that

23  she stopped working in October 2008 due to sleepiness caused by her medications.  (Doc. 6-9 at 43)

24  However, she returned to work after the brain surgery though, when "[h]er job was downsized in May

25  2010," she stopped working.  (Doc. 6-10 at 33)

26  By June 30, 2011, the Dr. Austin noted that her seizures were controlled but she was

27  complaining of fatigue, dizziness and vision problems which the doctor believed was due to too high

28  levels of carbamazepine.  (Doc. 6-10 at 46)  He instructed her to taper off the carbamazepine. Id.

3

Case 1:15-cv-00819-JLT   Document 15   Filed 09/12/16   Page 4 of 16

In July 2011, the plaintiff had suffered a seizure during her sleep.  (Doc. 6-10 at 48)  Dr. Austin continued to adjust her medications.  Id.  In August 2011, Ms. Wilkin's seizure activity was controlled, though Dr. Austin continued to adjust her medications.  Id.  The plaintiff reported that she "[n]eeds more rest in general and gets tired in the middle of the day since surgery and also with higher doses of medications.  Reducing medications does help, so seems to be a large part due to medications." Id. at 50-51.

On November 9, 2011, Nurse Practitioner Mideo Annie Luk reported that the plaintiff had no seizures "but still very tired and poor concentration.  She put in for long term disability."  (Doc. 10-11 at 6)  Ms. Wilkins completed a Function Report on December 21, 2011.[2]  (Doc. 6-7 at 32-39)  She reported she had no problem with her personal care and did not need reminders to engage in personal care or grooming needs or taking her medication.  Id. at 33-34.

Ms. Wilkins reported she walked the dog, fed it and cleaned up after it, though her husband also walked and fed the dog.  (Doc. 6-7 at 33.)  She reported that once or twice a week she prepared her meals of salads, sandwiches and other foods but she "eat[s] out mostly."  (Doc. 6-7 at 34)  However, she reported that cooking "makes me feel nauseous."  Id.  She did chores like laundry and cleaning and picking up "dog mess."  Id.  These chores took her one to one-and-a-half hours "a couple times a week."  Id.  Generally, she did these chores in the morning before her energy waned.  Id.  Ms. Wilkins report she must sleep "a couple of hours [during the day] and then go to sleep very early [and that she is] [t]ired most of the time." Id. at 33.  On the other hand, normally she went outside every day. Id. at 35.  She would go shopping for clothes, groceries and necessities "a couple [of] days a week [for] a couple of hours."  Id.  Though she could not pay bills or handle a savings account, she could count change and use the checkbook or money orders.  Id.  She reported that her husband now handles the bills and savings account because she "[f]eels more confident having my husband handle these things." Id. at 36.

Her hobbies included watching TV, reading, "go & watch sports games" and play on the computer.  (Doc. 6-7 at 36)  Except for going to sporting events which she did "a few times a month,"

---

[2] Mr. Wilkins completed a similar form the same day and it nearly exactly mirrors that which Ms. Wilkins indicated in her report.  (Doc. 6-7 at 52-61)

4

she did these activities throughout the week.  Id.  Though she used to be able to "use the computer all the time, [now it] makes me drowsy after awhile [sic]."  Id.  She regularly went to the grocery store ("almost every or every other day"), restaurants and hockey games.  Id.  Still, she did these things less often and stayed home more because she is "exhausted or don't feel motivated."  Id. at 39. Ms. Wilkins reported that she had no trouble getting along with others and  socialized with others on the telephone, on the computer and in person a couple of times per week. Id. at 36-37.

Ms. Wilkins reported she had difficulty with lifting, squatting, bending, walking, talking, stair-climbing, seeing, memory, completing tasks, concentration, understanding and following instructions but no difficulty standing, reaching, kneeling, hearing, using hands or getting along with others.  (Doc. 6-7 at 37)  She explained that she had a "[h]ard time w/concentrating & understanding instructions well.  I get tired w/most physical activities after awhile [sic]."  Id. at 37.  She reported she could walk about a half mile before resting.  Id.  She felt she could concentrate for only about "5 minutes or so." Id.  She felt she could follow instructions, if they were not too difficult, long or detailed.  Id.  She could handle changes in routine but wished she were better at handling stress.  Id. at 38.

On January 17, 2012, Luk reported that Ms. Wilkins "had 2 seizures last wk after she threw up during a GI viral illness, she is back to baseline . . . She is still tired but needs shorter naps (2 hrs instead of 3 or 3.5 hrs).  Her memory is not good, her husband feels she also has mild cognitive deficits after surgery.  Not able to return or find work."  Id. at 15.

On February 22, 2012, Ms. Wilkins underwent a psychological disability evaluation with, Psychological Assistant, Deborah von Bolschwing.  (Doc. 6-11 at 25-28)  Ms. Wilkins reported that she completed high school with average grades and afterward she received a certificate in medical management.  Id. at 25.  She last worked as a sales assistant at a financial investment company for six years until she was laid off in 2010.  Id.  This was her longest span of working.  Id.  Ms. Wilkins reported that she is independent and can do daily chores, can go grocery shopping, do dishes and laundry, prepare meals and dress and groom without assistance. Id. at 26.  She can drive a car or take the bus.  Id.

Dr. von Bolschwing found Ms. Wilkins to be alert and oriented, to have clear and coherent speech, to have liner and logical thought processes and to have no overt delusions, hallucinations or

1    other evidence of a thought disorder.  (Doc. 6-11 at 26)  To Dr. von Bolschwing, Ms. Wilkins appeared

2    to be mildly restricted in her affect, displayed a mildly anxious mood and she appeared to be nervous.

3    Id.

4            After testing, Dr. von Bolschwing found Ms. Wilkins had an average to high average intellect

5    and had average memory functioning.  (Doc. 6-11 at 27)  She was capable of understanding,

6    remembering and carrying out simple and complex instructions, she was capable of maintaining

7    attention and concentration and could maintain an adequate pace and persistence when completing

8    tasks. Id.  She was capable of managing her own funds, enduring stress and interacting with the public,

9    supervisors and coworkers and was mildly impaired in her ability to adapt to workplace changes. Id. at

10   27-28. Dr. von Bolschwing determined that Ms. Wilkins' medical condition was her only obstacle to

11   working.  Id. at 28

12           On March 29, 2012, Ms. Wilkins underwent additional psychological testing to determine

13   whether she suffered any impairment since her surgery.  (Doc. 6-11 at 41)  The psychologists

14   determined,

15           In summary, Mrs. Wilkins current neuropsychology profile is largely consistent with
         her pre-operative evaluation from 2009 demonstrating a mild frontotemporal
16       subcortical involvement. She was slightly slower than on previous testing which may
         reflect increased fatigue.  Overall, Mrs. Wilkins' profile is not completely consistent
17       with right temporal epilepsy and amygdalahippocampectomy as she has consistently
         demonstrated deficits in verbal story memory and learning.  However, fatigue and
18       difficulty maintaining attention are likely complicating factors.  Moreover, research has
         suggested that SAH can be associated with nonverbal memory loss for right sided
19       surgery and verbal memory loss for left sided surgery.  In addition, while she
         experiences significant fatigue after taking Lamictal, studies indicate that Lamictal does
20       not tend to have cognitive side effects.  Thus, it is likely that her increased levels of
         medications leading to fatigue, as well as her frustration regarding her limitations are
21       contributing greatly to her feelings of cognitive decline.  In addition, her more recent
         seizures also increase the risk of cognitive decline.
22

23   Id.  Thus, the psychologist recommended medication and behavioral adjustments to address fatigue

24   and "underlying depression and low motivation." Id.  The psychologists noted, however, that in her

25   2009 exam before surgery, Ms. Wilkins reported fatigue and taking "1.5-3 hour naps and was in bed

26   by 8:00 p.m." Id. at 45.

27           As a result of the March 29, 2012 evaluation, Ms. Wilkins was seen by Licensed Clinical

28   Social Work, Susan Ann Bower, on May 3, 2012, who noted Ms. Wilkins had been prescribed Zoloft

for 15 years to address depression.  (Doc. 6-12 at 8)  Ms. Bower referred the plaintiff to psychotherapy, group therapy for depression and medication management.  Id. at 10.  After this, Ms. Wilkins attended several group therapy sessions. Id. at 16-23, 35-56.

She saw psychiatrist, Dr. Gill on June 8, 2012 and complained about tiredness, difficulty concentrating and other cognitive decline.  (Doc. 6-12 at 25)  She reported to Dr. Gill, "I have a job interview Monday BUT I seriously doubt I will be able to do the job (b/c of cognitive decline)." Id. at 25. Ms. Wilkins reported that she had received medication for decades and that she has been diagnosed with depression but denied any history or symptoms of depression.  Id. at 26, 27.  Dr. Gill continued her on Sertraline and scheduled her for a follow-up appointment. Id. at 30.

On July 11, 2012, Ms. Wilkins met with her therapist and denied symptoms of depression but reported feeling anxious because she felt "she is not pulling her weight." (Doc. 6-12 at 43)  She is sleeping "half the time due to SE's of medications . . . can't do what she did before employment wise . . . not going places and now her husband won't go without her.  Pt. states she gets distracted easily, stating that she starts one thing, forgets, makes notes and forgets her notes.  Pt stated that she doesn't want to walk her dog and doesn't want to go to the gym." Id.  The LCSW encouraged her to start a morning routine of exercise. Id.  On August 16, 2012, Ms. Wilkins reported at her group session that while she enjoyed the social aspect of the group, she does not see how it could have helped her with feeling tired and poor concentration. She is open to other treatment plans as long as they will help address these concerns.  She is interested in working part-time either paid or as a volunteer; will consult w/team about volunteer activities in the area and email her with results." Id. at 55-56.  Indeed, the psychologist e-mailed Ms. Wilkins with ideas for volunteer work and recommended that she establish a daily routine and meet with a dietician to address her fatigue. Id. at 57.

In November 2012, Ms. Wilkins was hospitalized to allow a video EEG telemetry to record "persistent seizures."  (Doc. 6-13 at 34-35)  However, she did not have any seizure activity during the stay.  Id. at 34.  Dr. Austin discussed with Ms. Wilkins changing her medication to a "long acting version" which he believed would reduce the fatigue.  Id. By this time, she had not had a seizure for two months.  Id. at 36. While in the hospital, Dr. Austin reduced her anti-seizure medication and she reported feeling "more alert and less tired." Id. at 45, 46.

On March 9, 2012, Dr. W. Jackson performed a consultative evaluation.  (Doc. 6-4 at 6-13) His review of the medical records and statements of Ms. Wilkins indicated to him that, while she had seizures, they were controlled by medication.  Id. at 7.  He relied upon her own statements that she had not had a seizure in about two years to support this conclusion. Id. at 6-7.  Though he agreed that seizure precautions were required, he noted that her level of activity belied her claims of disabling fatigue.  Id. at 7.  He concluded Ms. Wilkins had no restrictions on activities of daily living and only mild difficulties in social functioning and in maintaining concentration, persistence or pace.  Id.  He relied upon the objective, psychological testing Ms. Wilkins underwent which revealed no significant limitations.  Id.  Dr. Jackson discounted Ms. Wilkins' description of her mental impairments as inconsistent with the objective testing.  Id. at 9.

Nurse Practitioner Luk completed a check-box "mental abilities" form and another form entitled "Medical Opinion re Ability to do Work-Related Activities (Mental), it appears, on July 2, 2013.  (Doc. 6-13 at 31-33)  The first form is signed only by Luk; the second is signed by Luk and Dr. Austin, though it appears he added his signature later, given the fact that it is squeezed in to the right of Luk's signature.  Id.  On the first form, Luk indicated that Ms. Wilkins could carry out very short and simple instructions, make simple work-related decisions, interact with the public appropriately and maintain appropriate social behavior, ask simple questions, be aware of normal hazards and travel in unfamiliar places with no impairment.  Id. at 31-32.  However, Luk opined that Ms. Wilkins would be impaired ten percent of an 8-hour day in remembering locations and work-like procedures, understanding and remembering very short and simple and detailed instructions, maintaining a regular attendance, working with others without being distracted by them or distracting them, accepting instructions and responding properly to criticism, responding properly to work setting changes and setting realistic goals.  Id.  Also, Luk opined that Ms. Wilkins would be impaired fifteen percent of an 8-hour day in carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday without interruption caused by psychologically based issues and perform at a consistent pace without unreasonable rest periods.  Id.

The second form considered many of the same topics as the first, though Luk's evaluation of the topics varied.  For example, where Luk had indicated that Ms. Wilkins would be impaired 10% of

an 8-hour day in remembering work-like procedures in the first form, in the second form, she indicated the impairment would be only five percent of the time.  (Doc. 6-13 at 31-33) This is the same with carrying out very short and simple instructions. Id.  Likewise, Luk showed Ms. Wilkins with improved abilities in performing at a consistent pace (from more than 15% deficit to a 5% deficit), maintaining sufficient attention and concentration to complete tasks timely (from more than 15% deficit to a 5% deficit), completing a normal workday without psychologically-based interruptions (from more than 15% deficit to a 10% deficit).  Id.  In other areas, Luk's evaluation of Ms. Wilkins' abilities decreased.  Id.

For example, in making simple work decisions (from no impairment to a 5% deficit), in accepting instructions and responding properly to criticism (from a 10% deficit to a 16% deficit), in responding properly to changes in work routine (from a 10% deficit to a 16% deficit), in being aware of normal hazards (from no impairment to a 10% deficit), in setting realistic goals (from a 10% deficit to a 16% deficit),  and in maintaining social functioning (from no impairment to a 16% deficit). Id. Luk also indicated Ms. Wilkins would have a 16% impairment in dealing with normal stress, a 5% deficit in performing routine tasks over and over without diversion or interruption or performing tasks with specific instructions that do not require independent action or judgment but no impairment in performing activities of daily living. Id. at 33.  The other topics were unchanged from the first form.

**B.    Administrative Hearing Testimony**

Plaintiff testified at the administrative hearing on July 15, 2013.  (Doc. 6-3 at 30-36.)  Ms. Wilkins reported that she last worked on May 5, 2010 and stopped working because she was laid off. Id. at 30.  At that time, her job title was sales assistant.  Id.  Her job involved "mostly clerical" work but sometimes she helped with customers. Id. at 43.

The plaintiff reported her primary medical concerns related to her exhaustion, having difficulty paying attention without being distracted.  (Doc. 6-3 at 30-31)  She reported that she had "a couple" seizures per year and that her epileptic condition was treated by medication.  Id. at 31.  The medication made her tired and caused her to feel nausea due to being intolerant of scents.  Id.  She reported that she ate at a restaurant for dinner every day and four times a week ate at a particular Mexican restaurant and always had cheese enchiladas because "it's plain."  Id.  She reported that she ate every breakfast at

a Subway restaurant because "there's no smells in there, and it's just plain.  All's I want is plain food."  Id.

After returning home from breakfast, she did chores like laundry and dishes, and then she lay down around 10 or 10:30 for a nap that would last one to three hours. (Doc. 6-3 at 33)  She would then "do a few more things" and lie down for a second nap around "2:00-ish."  Id.  During the day, she watched TV, played on the computer (Facebook, e-mail, etc.) and, after dinner, she watches more TV.  Id. at 33-34.  Generally, she dozes while watching TV after dinner.  Id. at 34.  She used to like to garden, read and socialize with her friends but, as to gardening she said, "I just have no interest and it's just  - - it takes too much out of me."  Id.  Her husband does most of the chores because doing chores "just wears [her] out."  Id. at 35.  To held her remember, she would draft a "to-do list" but sometimes left it at home.  (Doc. 6-3 at 35)

Ms. Wilkins reported she had a driver's license and would drive to the store but she'd only drive short distances due to the fatigue and because "it's just too overwhelming for [her]" due to anxiety. (Doc. 6-3 at 37)  She reported she was unable to drive on freeways due to anxiety and had not done so for years.  Id.

Mr. Wilkins testified also and reported that he spent all but six hours per day (during the work-week) with his wife and all day on the weekends.  (Doc. 6-3 at 39)  He testified that in his observation, since her brain surgery, she had difficulty "forming thoughts and getting her thoughts into words."  Id. at 40-41.  She will repeat questions he answered earlier.  Id. at 41.  He reported that he has had to take over paying the bills and they no longer did the housework and yardwork because she either became too tired or would lose her balance due to having to bend over.  Id.  Mr. Wilkins reported that he works only six hours per day because he takes her out to breakfast before work to make sure she eats before taking her medications and he comes home early to make sure she eats again.  Id. at 42.

Vocational Expert Judith Najarian testified.  (Doc. 6-3 at 43-45) The VE described Ms. Wilkins' past work as *DOT*[3] 201.362-030 and explained that this work was classified as sedentary

---

[3] *The Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).  The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d)(1).

exertion level and was SVP of 6.  Id. at  43.

The ALJ asked the VE to consider a hypothetical person with "the claimant's age and education and work experience with no exertional limitations but the person is limited to frequent climbing of ramps or stairs. No ladders, ropes or scaffolds." (Doc. 10-3 at 44.)  Furthermore, the ALJ clarified the person "must avoid even moderate exposure to operation or control of dangerous moving machinery as well as unprotected heights.  However, driving is not precluded." Id.  The VE opined this hypothetical person could perform the plaintiff's past work. Id.  However, if the person was limited to "simple, routine and repetitive tasks," the person would be unable to do the plaintiff's past work. Id.  However, there are other jobs the person could do including office helper.  Id. at 44-45.

The ALJ then asked the VE to consider the first hypothetical but added that the person needed two breaks in addition to the three break san employer gave already.  (Doc. 6-3 at 45)  The VE opined this person would have no work available.  Id.  Again, if the additional breaks were eliminated but the person would be absent from work two days per month due to fatigue, the VE reported there would be no work for the person.  Id.  Finally, if the absences were eliminated but the person would be off-task 15 percent of the time the person was supposed to be working on a task, the VE reported there would be no work.  Id.

## C.    The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the onset date of March 10, 2006. (Doc. 6-3 at 14.)  At step two, the ALJ found Plaintiff's seizure disorder was a severe impairment but her depression and anxiety were not.  Id. At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a listed impairment.  Id. at 15.  Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can frequently climb ramps and stairs, can never climb ladders, ropes of scaffolds, and must avoid exposure to operational control of dangerous moving machinery and unprotected heights, but can drive.

Id.  To determining the RFC, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence."  Id.

1  Consequently, the ALJ found Plaintiff was not disabled as defined by the Social Security Act. Id. at

2  19.

3  ### DISCUSSION AND ANALYSIS

4         In this action, the plaintiff complains that the ALJ failed to properly determine that fatigue was

5  a severe impairment and failed to factor it into the RFC.  (Doc. 13 at 8-9) In addition, the plaintiff

6  argues erred by afford more weight to the opinion of Dr. Von Boschwing than to Dr. Austin. Id. at 12-

7  14.

8  **A.     The ALJ did not err in failing to identify fatigue as a severe impairment**

9         At step two, the ALJ is required to determine whether the claimant's impairments when

10  considered in combination are severe. Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996).  "[T]he

11  step-two inquiry is a de minimis screening device to dispose of groundless claims."  Id.  In making this

12  determination, the ALJ must consider "the claimant's subjective symptoms, such as pain or fatigue, in

13  determining severity." Id.  The ALJ determined Ms. Wilkin's epileptic condition was severe without

14  regard for the fatigue she claimed as a result of the treatment of the seizures.  This failure would be

15  pertinent only if the ALJ determined that the seizure condition was not severe.  Thus, the impact that

16  the fatigue had on Ms. Wilkins is irrelevant because it did not prevent the ALJ from proceeding to step

17  three.

18  **B.     The ALJ did not err in failing to address the impact of fatigue in the RFC**

19         Notably, the evidence of Ms. Wilkins' claimed fatigue was from Ms. Wilkins' subjective

20  complaints.    Though Ms. Wilkins cites to various portions of the medical records to support the

21  fatigue, she ignores that these reports simply note her subjective complaints.  Thus, if the ALJ

22  properly determined that her subjective complaints were not believable, her subjective statements

23  when repeated by doctors carry no greater weight.

24         "To determine whether a claimant's testimony regarding subjective pain or symptoms is

25  credible, an ALJ must engage in a two-step analysis. First, the ALJ must determine whether the

26  claimant has presented objective medical evidence of an underlying impairment which could

27  reasonably be expected to produce the pain or other symptoms alleged. The claimant, however, need

28  not show that her impairment could reasonably be expected to cause the severity of the symptom she

has alleged; she need only show that it could reasonably have caused some degree of the symptom. Thus, the ALJ may not reject subjective symptom testimony...simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged. Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Lingenfelter v. Astrue, 504 F.3d 1028 (9th Cir. 2007). However, "the ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking...." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).

"The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." Valentine v. Comm'r of Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) (quoting Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)). The ALJ may consider the "'[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between his testimony and his conduct, [claimant's] daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains.'" Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002) (modification in original) (quoting Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)). The ALJ may reject the subjective complaints by offering clear and convincing reasons for doing so. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008).

The ALJ found Ms. Wilkins' subjective complaints of fatigue, seizure activity and cognitive impairment to be unsupported. The ALJ found,

> I find the claimant less than fully credible. Objective testing revealed her limitations were far less severe than alleged; she was assessed with few deficits on mental status evaluation; and she expressed an interest in returning to work. I note that testing showed no change in the claimant's cognitive functioning from 2009, when she worked full time to 2012, when she claims disability due to, in part, cognitive disability. I also find it significant that claimant continued to drive a motor vehicle during most if not all of the period since the alleged onset date, sometimes with passengers. This fact alone suggests that both her reported fatigue and seizure frequency are significantly less that she alleges at the hearing, assuming that she would not endanger the lives of others (loved ones or other motorists/pedestrians).

(Doc. 6-3 at 19) In addition, the ALJ rejected Ms. Wilkins' claim that she must eat only "plain" food and go to only places with "plain" smells because this claim was belied by her statement that she must

eat at a Mexican restaurant four times per week for dinner and at Subway for breakfast.  Id.  The ALJ

observed, "She claims that she does not cook, because the smell makes her ill, and instead goes out to

eat.  However, she goes to a Mexican restaurant about 4 times per week and can have cheese

enchiladas, begging the question of how she can bear the smells in restaurants making numerous

fragrant dishes" Id.  The ALJ observed also, "she goes to Subway (where the smell of baking bread

permeates the premises) for breakfast . . ." Id.

     In addition, the ALJ rejected the description of the frequency of seizure activity as reported by

Ms. Wilkins.  (Doc. 6-3 at 16)  The ALJ noted, "On February 8, 2011[4], she reported she had had 3

seizures in January 2012 and 1 each in May and July 2011 [Citation], begging the question why she

did not report her May and July 2011 seizures in her report on December 21, 2011 [Citation].  She

again admitted that medication controlled her seizures most of the time. [Citation] The husband

provided the same information that the claimant did in her 2 reports. [Citation]." Id. As noted by the

ALJ, in her December 2011 report she indicated only that she had two seizures in April 2011. (Doc. 6-

7 at 29)

     In addition, Ms. Wilkins's claims of cognitive impairment was contradicted by the objective

testing.  As indicated above, her objective testing revealed she had an average to high average intellect

and had average memory functioning.  (Doc. 6-11 at 27-28)  She was capable of understanding,

remembering and carrying out simple and complex instructions, she was capable of maintaining

attention and concentration and could maintain an adequate pace and persistence when completing

tasks. Id.  She was capable of managing her own funds, enduring stress and interacting with the public,

supervisors and coworkers and was mildly impaired in her ability to adapt to workplace changes. Id.

     On the other hand, though she reported an increased need to take naps, in fact, her need was

unchanged after her surgery.  (Doc. 6-3 at 18) Before her surgery, while working full time in 2009,

Ms. Wilkins reported fatigue and taking "1.5-3 hour naps and was in bed by 8:00 p.m."  (Doc. 6-11 at

45).  At the hearing after her surgery, she testified to taking naps of up to three hours. (Doc. 6-3 at 33)

---

[4] While Ms. Wilkins dated the document as "2-8-11," it appears she erred and that it was executed in 2012, rather than
2011 based upon the information reported in it, e.g., last EEG done on 3-10-11 (which would have been a month after the
document was signed).

1    The ALJ also relied upon the 2012 cognitive testing which found few differences in her

2 abilities pre- and post-surgery and noted that the Wilkins' statements about the plaintiff's abilities and

3 fatigue were similar to their statements made before the surgery. (Doc. 6-3 at 18) Thus, the Court finds

4 that the ALJ provided specific, clear, and convincing reasons for discounting plaintiff's testimony that

5 she suffered from disabling symptoms and functional limitations that precluded work.

6 **C.    The ALJ did not err in affording great weight to Dr. von Bolschwing**

7    To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its

8 source, courts consider whether (1) contradictory opinions are in the record and (2) clinical findings

9 support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical

10 professional only for "clear and convincing" reasons. Lester v. Chater, 81 F.3d 821, 831 (9th Cir.

11 1995). In contrast, a contradicted opinion of a treating or examining professional may be rejected for

12 "specific and legitimate" reasons that are supported by substantial evidence. Id. at 830. Though a

13 treating professional's opinion generally is accorded superior weight, if it is contradicted by a

14 supported examining professional's opinion (e.g., supported by different independent clinical

15 findings), the ALJ may resolve the conflict. Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir.1995)

16 (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989)). In any event, the ALJ need not give

17 weight to conclusory opinions supported by minimal clinical findings. Meanel v. Apfel, 172 F.3d

18 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see

19 also Magallanes, 881 F.2d at 751. The opinion of a non-examining professional, without other

20 evidence, is insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at

21 831.

22    Plaintiff argues that Dr. von Bolschwing's opinions failed to consider the subjective

23 complaints of fatigue and failed to consider the medical record and balks at the weight the ALJ placed

24 on this opinion and the ALJ's decision to afford the opinion of Dr. Austin less weight.  (Doc. 13 at 12-

25 13)  However, the ALJ afforded so much weight to Dr. von Bolschwing's opinion because it was

26 based upon objective testing.  (Doc. 6-3 at 18)  Specifically, the ALJ noted "I give Ms. Luk's opinion

27 reduced weight because . . . the objective evidence does not support her conclusions.  For example, Dr.

28 von Bolschwing indicates the claimant has far fewer and less severe symptoms and limitations."  Id.

Notably, Dr. von Bolschwing's testing *did* consider Ms. Wilkin's ability to maintain an adequate pace and persistence when completing tasks, to recall, to carry out simple and complex instructions and to maintain attention and concentration and all of these areas were measured using objective criteria. (Doc. 6-11 at 27)  On the other hand, Dr. Austin's evaluation, assuming it was his rather than the Luk's, did not[5].  On the check-box form, Dr. Austin offered opinions on limitations[6] that could be and were evaluated by objective testing but he failed, apparently, to consider this.  Indeed, there is no indication upon what evidence Dr. Austin relied in completing the forms.  Thus, the ALJ did not err in assessing the weight of these opinions and, therefore, did not err in stating the RFC.

### CONCLUSION AND ORDER

Therefore, the conclusion that Plaintiff is not disabled as defined by the Social Security Act must be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1.      The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Laura Wilkins.

IT IS SO ORDERED.

Dated:   **September 12, 2016**                    **/s/ Jennifer L. Thurston**
                                                                            UNITED STATES MAGISTRATE JUDGE

---

[5] As noted above, the check-box forms used by Dr. Austin/Luk contradicted each other in most of the areas surveyed. However, because the ALJ failed to note this, the Court likewise does not rely upon it here but, indeed, this is curious.
[6] Like Dr. von Bolschwing, Dr. Austin did not refer to the plaintiff's claims of fatigue when completing the forms.